UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| CHARLES AUSTIN, AGNES | ) | |
| AUSTIN, INDIVIDUALLY AND | ) | |
| AS NEXT FRIENDS OF S.A., C.A., | ) | |
| AND A.A, THEIR MINOR CHILDREN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-28-B-W |
| | ) | |
| TOWN OF DEXTER, | ) | |
| | ) | |
| Defendant. | ) | |

***RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT***

The plaintiffs in this civil rights action, removed to this court from the state court by the defendant, claim that the Town of Dexter discriminated against them because they are African Americans.  The Town of Dexter has filed a motion for summary judgment and the Austins have responded with a memorandum with an attachment of twenty-three exhibits.  They have not filed a paragraph-by-paragraph response to the Town's statement of fact or a separate statement of additional facts.  I recommend that the Court grant the motion for summary judgment as against Charles and Agnes Austin (Docket No. 35).  Because the three children are not represented by licensed counsel, I recommend that the action be dismissed against them without prejudice.

***Discussion***

***Sustainability of this Action as to the Three Minors***

The first order of business in this recommended decision is to make it crystal clear that this action is no longer forwarded on the behalf of the three children of Charles and Agnes Austin, designated in the caption S.A., C.A., and A.A.  This action was initiated in the state

courts by the Austins when they were represented by an attorney.  I granted a motion by the

Austins' attorney to withdraw, the Austins not having filed an objection.  (Docket No. 15.)

Charles and Agnes Austin cannot now press this action on behalf of their children as they are not

licensed attorneys.    In an order on the Austins' motion to amend I made it clear to Charles and

Agnes Austin that Charles Austin, who had filed the motion to amend and who is not a licensed

attorney, cannot seek a legal remedy in a civil action on behalf of his wife and his children.

Austin v. Dexter, Civ. No. 07-28, 2008 WL 113894, *2 (D.Me. Jan 9, 2008).

I reiterate this conclusion now and stress that this recommended disposition would not be

an adjudication of any legal claim of the three Austin children.  As the Second Circuit explained

in Cheung v. Youth Orchestra Foundation of Buffalo, Inc.:

> [W]e agree with Meeker v. Kercher, 782 F.2d 153, 154 (10th Cir.1986) (per
> curiam), that a non-attorney parent must be represented by counsel in bringing an
> action on behalf of his or her child. The choice to appear pro se is not a true
> choice for minors who under state law, see Fed.R.Civ.P. 17(b), cannot determine
> their own legal actions. There is thus no individual choice to proceed *pro se* for
> courts to respect, and the sole policy at stake concerns the exclusion of non-
> licensed persons to appear as attorneys on behalf of others.
>    It goes without saying that it is not in the interests of minors or
> incompetents that they be represented by non-attorneys. Where they have claims
> that require adjudication, they are entitled to trained legal assistance so their rights
> may be fully protected.

906 F.2d 59, 61 (2d Cir. 1990) (guardian); accord Johns v. County of San Diego, 114 F.3d 874,

876 -77 (9th Cir. 1997) (guardian);  Osei-Afriyie by Osei-Afriyie v. Medical College of Pa., 937

F.2d 876, 882 -83 (3d Cir. 1991) (parent); cf. Winkelman v. Parma City School District, 550

U.S.  ___, __ - __ 127 S. Ct. 1994, 1998-2000 (2007); Maroni v. Pemi-Baker Reg'l School Dist.,

346 F.3d 247 (1st Cir. 2003); see also O'Diah v. Volkswagen of America, Inc. No. 03-104,  2004

WL 67331, **1 (Jan 14, 2004) (unpublished).[1] Counter to the Town of Dexter's contention that it is entitled to summary judgment as to the children's claims (Summ. J. Mem. at 8), I recommend that the claims of S.A., C.A., and A.A. be dismissed without prejudice.

### Allegations in Complaint

For the most part, the allegations of the Austins' complaint, drafted by the lawyer then representing them, are conclusory – although adequate under the notice pleading requirements. The Austins' children "were subjected to repeated physical assaults" while attending Dexter schools (Compl. ¶ 7); Charles and Agnes Austin repeatedly requested assistance from the Town of Dexter police department to address hate crimes and other damage or personal injury to their children (id. ¶¶ 8,9);  the parents repeatedly requested assistance from the Town to pursue criminal charges against individuals who assaulted their children but the police and town refused to do so (id. ¶¶ 10, 11); the Dexter police department made false accusations against Charles and Agnes Austin and verbally harassed then on numerous occasions (id. ¶ 13); the chief of police made a statement to Charles Austin to the effect that he "was incapable of owning his own home, presumably because Charles Austin is an African-American" (id. ¶ 14); during their Dexter residence, Charles and Agnes were subjected to discriminatory motor vehicle stops suggestive of racial profiling (id. ¶ 15); and the Town of Dexter "acted with deliberate indifference" towards the Austins when it failed to correct a sewage leak in their home and in failing to respond to requests for assistance of the animal control officer (id. ¶¶ 16, 17).  In terms of the theory of recovery against the Town the complaint alleges:  "Upon information and belief, the Town of Dexter, has adopted a custom, policy or practice of racial discrimination by acting with

---

[1]     Clearly in the First Circuit, after Maroni, parents are permitted to represent their child's interest pro se regardless of whether they are pursuing procedural or substantive claims in IDEA cases.  However, until instructed otherwise, I will limit the holding of Maroni  to the IDEA context.  See Woodruff ex rel. B.W. v. Hamilton Tp. Public Schools, Civ. No. 06-3815 (NLH), 2007 WL 4556968, *2 -5  (D.N.J. Dec. 20, 2007).

deliberate indifference to Plaintiffs' constitutional rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution."  (Id. ¶ 18.)

### Summary Judgment Standard

"At the summary judgment stage," the United States Supreme Court explained in Scott v. Harris, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." __ U.S. __, __, 127 S. Ct. 1769, 1776 (2007) (citing Fed. Rule Civ. Proc. 56(c)).  Scott reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)).  The Austins cannot defeat summary judgment by relying on "conclusory allegations, or rank speculation."  Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007) (quoting Fontánez-Núñez v. Janssen Ortho LLC, 447 F.3d 50, 55 (1st Cir. 2006)).

The District of Maine has a local rule pertaining to summary judgment.  District of Maine Local Rule 56 as relevant provides:

> **(c) Opposing Statement of Material Facts.** A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. Each such statement

shall begin with the designation "Admitted," "Denied," or "Qualified" and, in the case of an admission, shall end with such designation. The opposing statement may contain in a separately titled section additional facts, each set forth in a separately numbered paragraph(s) and supported by a record citation as required by subsection (f) of this rule.

....

**(f) Statement of Facts Deemed Admitted Unless Properly Controverted; Specific Record of Citations Required.** Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

Dist. Me. Loc. R. 56(c),(f).

In responding to the motion for summary judgment the plaintiffs have filed a "Memorandum of Facts and Laws to Support Plaintiff's Answer to Defendant's Motion" and twenty-three exhibits.  There is no statement of facts that responds paragraph-by-paragraph to the Town's statement of facts.  Although their memorandum contains factual assertions many of which are followed by citations to the plaintiffs' exhibits, there is no statement of additional facts supported by record citation.  Three of the plaintiffs' exhibits are lists of wrongdoings but these are not in affidavit form and bear no original signatures.  Clearly, the Austins have not complied with the local rule and the Town of Dexter in its reply memorandum argues that the plaintiffs' effort is insufficient to defeat summary judgment.   The Town has not attempted to respond to the factual assertions in the plaintiffs' memorandum.

Two cases in the District of Maine guide my treatment of the Austins' memorandum and exhibits filed in opposition to summary judgment. <u>Clarke v. Blais</u>, 473 F.Supp.2d 124 (D. Me. 2007), was a case in which the (likewise <u>pro se</u>) plaintiff had a similar nonconforming response

5

to a summary judgment motion targeting the plaintiff's pre-trial detention excessive force claim. In that case the plaintiff's opposition included "his version of the facts, references to paragraph numbers of a document that he did not file, "P.S.M.F." (Plaintiff's Statement of Material Facts?), and exhibits that he did file. He did not mention either his affidavit or his deposition in the opposition."  Id. at 128.  Judge Hornby reasoned:

> What makes this case distinct is the following: the plaintiff made very clear in his response to the motion (his "Opposition") the precise nature of his disagreement with the officers' version of what happened; the affidavit filed with the Amended Complaint supported the plaintiff's version and demonstrated from the outset that there was a competent witness (the plaintiff himself) with sufficient admissible evidence to allow the plaintiff to get to a factfinder on his excessive force claim, whatever might develop in discovery (unless he were to recant his story); the plaintiff was not someone who chose to proceed without a lawyer, thereby risking voluntarily the consequences of his ignorance of the rules, but instead requested appointment of a lawyer repeatedly; the plaintiff has mental and medical issues; the defendants confirmed for themselves during discovery that there was a genuine issue of material fact on the excessive force claim by taking the plaintiff's deposition and asking him about it, and they presented that entire deposition to the court as part of their motion for summary judgment, on notice that the plaintiff's testimony from the deposition and the affidavit created a genuine issue of material fact; and the Magistrate Judge was aware (as am I) of the affidavit (it would be difficult to decide a motion for summary judgment without reading the Amended Complaint, which included the affidavit).  No record scouring was required. Although there may be occasions where a plaintiff's failure of the sort that occurred here would unfairly prevent a meaningful defendants' reply, see Sirois v. Prison Health Services, 233 F.Supp.2d 52, 55 & n. 2 (D.Me.2002), this is not such a case. Here, there is a clear credibility conflict between what the plaintiff says happened and what the defendants (particularly Sergeant Blais) say happened. The issue concerns a material fact. A defendant's reply cannot alter that.

Id. at 130 (footnote omitted).

In Demmons v. Tritch, 484 F. Supp. 2d 177 (D. Me. 2007)  this Court addressed a summary judgment record in which the pro se plaintiff failed to respond at all to the summary judgment motion prior to the issuance of my recommended decision.   This Court discussed the

"fair notice" rule for pro se litigants, addressed Clarke, id. at 182-83, and proceeded by weighing the facts in the plaintiff's verified complaint, concluding: "Taken as a whole, including the facts in the verified complaint, the record does not support a claim of deliberate indifference, even when viewed in the light most favorable to Mr. Demmons." Id. at 185.

This case is different than Clarke in many respects. The Austins are not incarcerated and do not face the limitations on access to legal materials and legal professionals that inmates do. In contrast to Clarke, the Austins had retained counsel when they commenced this law suit and when that attorney withdrew they indicated they would retain substitute counsel and had two attorneys considering whether or not they would take the case. (See Docket No. 17.) Furthermore, in their memorandum in response to the motion for summary judgment the Austins indicate that both the NAACP and MCLU have helped them "immensely in this matter and are still continuing to help them through their attorneys, David Lloyd and Diane Khiel and other staff members." (Mem. Opp'm Summ. J. at 8.) "The Bangor and Portland chapters" of the NAACP, according to the Austins, "are still looking into this case as they are guiding the Plaintiffs along." (Id.) Ever since their original attorney withdrew, the Austins have been actively engaged in the discovery process. In this responsive memorandum Austin represents that he has plenty of additional corroborating evidence for these claims at his disposal (Mem. Opp'n Summ. J. at 8, 10) but has not chosen to provide this for summary judgment purposes. And unlike Clarke this is not a contest about two simple, contradictory versions of events; it is a multi-faceted deliberate indifference equal protection custom and policy claim. As the District of Maine does not have a local rule requiring something along the line of a caution to the pro se plaintiff by the moving party, see Demmons, 484 F.Supp.2d at 183 n.7, and in view of the facets of this case highlighted above, I conclude that it is not fair to these defendants for me to scour the

pleadings and to cull disputed facts out of Austin's Exhibit Nos. 10, 11, and 12 or his memorandum.  Nothing in the Austins' surreply (see Docket No. 41) dissuades me of the necessity of this approach given the parameters of this particular case.   Even if I were to extract facts from Austin's submissions, those individual facts could not be strung together in a way that would establish a custom or policy claim against the Town of Dexter, the only defendant named in this complaint.

### *Standard for Analyzing The Plaintiffs' Claim that the Town of Dexter was Deliberately Indifferent to the Violations of their Right to Equal Protection*

The Austins' claim against the Town of Dexter must be analyzed under the Monell v. Department of Social Services, 436 U.S. 658 (1978) municipal liability standard.  There are three variants of such a claim, but the only conceivable variant for the Austins is that the Town of Dexter has an unwritten custom of being deliberately indifferent to the equal protection violations of its employees.

> There are two requirements to prove a claim grounded on custom. First, the custom or practice must be attributable to the municipality. That is, it must be "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice."  Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir.1989). Second, the custom must have been the cause of and "the moving force behind" the constitutional violation. Id. at 1157.

Whitfield v. Melendez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005).

With respect to the underlying necessity of demonstrating that an employee or employees of the Town of Dexter violated their rights under the equal protection clause of the Fourteenth Amendment, to survive summary judgment the Austins must create a genuine dispute that the Town employee/employees acted with "racially discriminatory intent or purpose."  Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977); see, e.g., Walker v.

City of Bogalusa, 168 F.3d 237, 239 -40 (5th Cir. 1999); Dickens v. State of Mo. by Ashcroft, 887 F.2d 895, 896 (8th Cir. 1989); Chicago Miracle Temple Church, Inc. v. Fox, 901 F.Supp. 1333, 1345 -47 (N.D.Ill. 1995). A showing of a racially disproportionate impact is not sufficient. Village of Arlington Heights, 429 U.S. at 265. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Id. at 266.

### *Town of Dexter Statement of Material Fact*

At all times relevant to the above-referenced matter, Judith A. Doore, was employed as the Town Manager for the Town of Dexter, Maine and Arthur Roy was employed as the Police Chief in the Town of Dexter.

In her capacity as Town Manager, Judith A. Doore, had numerous occasions to interact with Charles Austin regarding complaints he was making on his own behalf or on behalf of his children. Doore's interactions with Charles Austin have been by correspondence, telephone, and in-person when Mr. Austin would show up at the Town Office and insist on speaking with her about some issue. Doore is not aware of any complaint of racial discrimination by town employees or officials ever having been made by Agnes Austin.

During the 2004 through 2006 period, Chief Roy and other officers with the Dexter Police Department had numerous interactions with Charles Austin -- as a complainant, as a victim, and as a perpetrator. Mr. Austin has often criticized Town employees, particularly Town Manager Doore and Police Chief Roy, when the demands he made were not met to his satisfaction. Mr. Austin frequently made unfounded allegations that Town employees were racist and that they were somehow affiliated with the Ku Klux Klan. In Chief Roy's experiences

with Mr. Austin, Mr. Austin routinely made unfounded accusations of racial profiling and racially-motivated discrimination by Chief Roy and his subordinate officers.

Mr. Austin has posted signs on his property suggesting that Town officials, including Chief Roy and Town Manager Doore, were affiliated with the KKK.  Mr. Austin also alleged that officials in SAD 46, the school district which Dexter school children attend, were racist and condoned bullying, harassment, and physical attacks upon his children in the school.  Mr. Austin believes that there are currently ongoing KKK activities in the Town of Dexter.  Mr. Austin believes that organizations in the Town of Dexter, such as the Rotary Club, the Free Masons, and other fraternal organizations, are merely fronts for the KKK.  Mr. Austin also believes that Maine Superior Court justices have been members of the KKK because their KKK robes allegedly were found in a closet in the Superior Court in Portland.

As a law enforcement officer, it is Chief Roy's duty to enforce the laws, including laws pertaining to hate crimes and racial discrimination.  Chief Roy never saw evidence of the kind of discriminatory conduct of which Mr. Austin accused officers of the Dexter Police Department, and would have taken action against any individual engaged in such conduct.  The Dexter Police Department has had many contacts with Mr. Austin.  During the time Mr. Austin lived in Dexter, a significant amount of time was spent by employees in the Town office dealing with Mr. Austin, either in person or by telephone.  Town employees were polite and patient with Mr. Austin, though his demeanor was often rude, hostile, confrontational, and aggressive.

Mr. Austin's conduct and manner has been disconcerting and even frightening to employees in the Town office, especially in light of his professed expertise in martial arts. Despite Mr. Austin's actions, however, Town employees and Town officials listened to his complaints, investigated the facts, and responded appropriately to him.  If Mr. Austin was not

10

satisfied with the Town's response, however, he routinely attributed the Town's failure to appease him to overt racism against him and his family on the part of Town employees and/or officials.  Town Manager Doore never saw evidence of any conduct by Town employees with respect to Mr. Austin or his family that appeared to be racially motivated.

In June 2005, Mr. Austin reported to the Dexter Police Department that his son had been assaulted by another young male on school property.  Mr. Austin's son was attending SAD 46 at the time.  The assailant was a 19-year-old mixed-race Dexter resident.  Because the assault was not witnessed by any Dexter police officers, when the investigating officer located the alleged assailant he could only summons him for the assault and could not legally arrest him.  Town Manager Doore learned from Chief Roy that the assailant had been identified by Dexter police and summonsed for the assault on Mr. Austin's son.   Mr. Austin understands that under Maine law if a police officer does not witness the commission of a misdemeanor he cannot lawfully arrest the perpetrator.   Despite this knowledge, Mr. Austin was not satisfied that the assailant had been summonsed and demanded that he be arrested immediately as a danger to society. Mr. Austin also claimed that his son had been assaulted with a dangerous weapon.

A week after the assault, Town Manager Doore received a letter from Mr. Austin, dated June 20, 2005, indicating that his son had been punched in the face with brass knuckles and demanding that the assailant be arrested "as a danger to the community and society."  Mr. Austin requested that Doore use her "powers" as Town Manager to have the assailant arrested.  As Doore has no arrest powers she deferred to the Dexter Police Department to handle the assault complaint.  When the assailant was not arrested, Mr. Austin demanded that Doore fire Chief of Police Art Roy.  When Doore refused to fire the police chief, Mr. Austin placed signs in the window of his karate studio calling her a "racist" and a "bigot."   The following day, June 21,

11

2005, Doore received a memo from Mr. Austin indicating that a doctor had confirmed that his son was assaulted with a dangerous weapon.  Mr. Austin advised Chief Roy that his son's treating physician had confirmed that the assailant had used a dangerous weapon. Mr. Austin supplied the Dexter Police Department with a copy of the doctor's report.  The doctor's findings, which were documented in his report, were equivocal as to whether or not anything besides a bare fist had been used in the assault.  While the doctor found it hard to believe the injury had been caused with a bare fist, he concluded that "the etiology of these wounds are unclear."  No weapon was ever identified that could be used to upgrade the charge to a felony level assault. Mr. Austin's son, the assault victim, was unable to say whether anything besides a bare fist had been used.   In his memo to Town Manager Doore of June 21, 2005, Mr. Austin again demanded that the assailant be arrested as soon as possible.  Doore again deferred to the Police Department and the District Attorney with regard to the prosecution of the assailant of Mr. Austin's son.  The assailant was eventually convicted of assaulting Mr. Austin's son.  Doore was aware that the assailant was charged and convicted of assault.[2]

On July 25, 2005, Town Manager Doore received a letter from Mr. Austin, requesting that both she and Chief Roy resign, calling them "lazy racist officials" and "inherently racist bigots."  Mr. Austin's allegations in his letter of July 25, 2005, were copied to Maine's congressional delegation, the Governor, and other elected officials, as well as to organizations such as the NAACP and the MCLU.  Doore responded by written correspondence to Mr. Austin's letter of July 25, 2005, on the same day it was received. In her letter of July 25, 2005, Doore requested specific evidence to support the blanket assertions Mr. Austin was making that

---

[2]       The Town, thus, opines that Mr. Austin's claim that the Dexter Police Department "did not pursue criminal charges against any person who committed a crime against the Austin family" is patently false.

Town employees and officials were racists and bigots.  Doore also specifically requested in her letter of July 25, 2005, that Mr. Austin provide any evidence or information he had that Town employees or officials had acted in a discriminatory manner, or with a racially discriminatory purpose or motive, toward him or his family.  In her letter of July 25, 2005, Doore also asked for specific evidence or information concerning any insensitivity to minority issues that Mr. Austin claimed to have experienced in his interactions with Town employees and officials.  Doore further advised Mr. Austin that she would investigate any such conduct on the part of Town officials or employees and take any action that was appropriate.  There was no way for Doore to respond to Mr. Austin's numerous and wide-ranging allegations in the absence of any specific evidence that supported his claims of racism on the part of Town employees or officials.  Doore saw no evidence of the kind of widespread racism, racial insensitivity, and/or links to organizations such as the KKK of which Mr. Austin was complaining.  Although Mr. Austin was not satisfied with the Town's response to his allegations, Doore and/or other Town officials always took them seriously, investigated them to the extent possible given their general nature, and tried to inform Mr. Austin as to their findings.

In the fall of 2005, during a period of heavy rainfall, Mr. Austin apparently experienced water seeping into his basement, as did many other Dexter homeowners.  Mr. Austin was convinced that his basement was being flooded with sewage coming from Crosby Park, a Town-owned property adjacent to the Austin residence.  Town Manager Doore referred the investigation of Mr. Austin's complaint regarding his basement flooding to the Town's Public Works Director and the Utility District Operator.  Doore also consulted with Fire Chief Wyman and the Town's Public Health Officer, David Pearson, regarding Mr. Austin's claims regarding his basement flooding.  By letter of October 27, 2005, Town Manager Doore advised Mr. Austin

of the steps the Town was taking to address his complaints.  The final results of the Town's investigation into Mr. Austin's complaints regarding his basement flooding were conveyed to Mr. Austin by Doore's subsequent letter of November 7, 2005.  The Town's investigation showed there were no town water or sewage lines in the area that would account for any leakage into Mr. Austin's basement, and that the water seeping into the basement was simply surface water runoff from adjacent land that was higher in elevation than Mr. Austin's land.

On November 8, 2005, Town Manager Doore sent another letter to Mr. Austin attempting to explain that the Town was not responsible for the water problems in his basement and to advise him that no projects were currently being funded that would address surface water runoff in the area as he desired.  Doore's letter of November 8, 2005, also addressed the demands made by Mr. Austin in the Town Office on October 31, 2005, concerning this situation.  In her letter of November 8, 2005, Doore also reiterated that she had not been able to substantiate Mr. Austin's claims of racial profiling and tolerance of hate crimes against him and his family by Town employees or officials.  Doore also promised in her letter of November 8, 2005, to Mr. Austin that anyone committing such crimes would be prosecuted to the fullest extent of the law and that such conduct would not be tolerated.  Despite the steps that were taken by various Town officials to address the water leakage into Mr. Austin's basement, Mr. Austin has accused the Town in his Complaint of deliberate indifference by failing to take proper corrective measures to address an alleged sewage leak into the Austin home.

In October 2005, an off-duty Veazie police officer who resides in Dexter, radioed Dexter police to report a gold Mercedes being driven erratically on the road leading toward the Town of Dexter.  After locating the vehicle and observing its operation from approximately one-hundred-yards behind it for two miles, Dexter Police Officer Jon Brown pulled over the Mercedes. The

gold Mercedes pulled over by Officer Brown was being driven by Mr. Austin.  In addition to

failing field sobriety testing, Mr. Austin tested at a .11 blood alcohol level on the Intoxilyzer.

Officer Brown arrested Mr. Austin for operating a motor vehicle under the influence of alcohol.

Mr. Austin subsequently pled guilty to operating under the influence.

      Mr. Austin complained to Chief Roy that his OUI arrest was racially motivated and that

he was only stopped because he was black.   Chief Roy investigated the matter of Mr. Austin's

complaints related to his OUI arrest.  Chief Roy determined that Mr. Austin was pulled over by a

cruiser that was behind him, very late at night, and that Officer Brown was not in a position to

ascertain the race or identity of the driver.  The initial targeting of this vehicle was caused by a

radio call from an off-duty Veazie police officer reporting an erratically operated vehicle heading

toward Dexter.   Officer Brown was unaware that Mr. Austin was driving the vehicle until he had

the vehicle stopped and approached the driver, whom he then recognized. Mr. Austin's arrest

was caused by his appearance, speech, performance on field sobriety tests, and finally the blood

alcohol level detected by the Intoxilyzer. Chief Roy saw nothing inappropriate about this

incident and concluded there was no racial motivation involved in the vehicle stop or Mr.

Austin's subsequent arrest.  While Chief Roy saw nothing inappropriate about this arrest, Mr.

Austin continued to complain that he was being racially profiled by the Dexter Police

Department, even though he pled guilty to the crime for which he was arrested.[3]

      The Dexter Police has a List of Contacts which documents all contacts with Charles

Austin in which he was a complainant, a victim, or the perpetrator of a crime.  Mr. Austin was a

frequent caller on the 911 emergency line. Mr. Austin repeatedly called the 911 emergency line

---

[3]     In their responsive memorandum the Austins insist: "The OUI case is absolutely irrelevant to this case
because Mr. Austin is not using it against the police as racial profiling solely because he pled Alfond to it."  (Mem.
Opp'n Summ. J. at 4.)

to complain about how he was being treated in Dexter or other things that were not emergencies. Mr. Austin's frequent calls interfered with the ability of the emergency dispatcher to handle emergency calls. As a result of Mr. Austin's frequent abuse of the 911 emergency line, he was given a warning by Dexter police to cease making non-emergency calls to the 911 emergency dispatcher.  After Mr. Austin continued to make 911 calls to simply air his complaints against the Town and the Police Department, and after ignoring warnings to cease using the 911 emergency line for such purposes, Mr. Austin was cited for harassment by telephone.  Mr. Austin's response to being cited for harassment by telephone was to allege that the decision to charge him was racially motivated.

In early 2006, Chief Roy learned that Mr. Austin was on probation for a criminal conviction in Rhode Island.  Chief Roy had several conversations with Mr. Austin's Rhode Island probation officer.  In conversations with Mr. Austin's probation officer, Chief Roy learned that the terms of Mr. Austin's probation required him to reside in Rhode Island. Mr. Austin's Rhode Island probation officer advised Chief Roy that he wanted Mr. Austin to return to that state pursuant to the requirements of his probation.  Chief Roy subsequently spoke to a different Rhode Island probation officer who indicated that she had taken over Mr. Austin's case from his former probation officer, who had just retired.  This new Rhode Island probation officer advised Chief Roy that Mr. Austin's probation required him to reside in Rhode Island and that she intended to force him to return and comply with its terms.  Chief Roy reviewed the decision of the Rhode Island Supreme Court captioned State of Rhode Island v. Charles Austin, which affirmed Mr. Austin's conviction and prison sentence for beating his girlfriend over the head with a brandy bottle until she was unconscious. After Chief Roy's review of the Rhode Island court decision and discussions with Mr. Austin's probation officers in Rhode Island, he

16

learned that Mr. Austin was a convicted felon who, upon being released from prison, was required to reside in Rhode Island during the period of his ensuing probation. The Rhode Island probation officer required Mr. Austin to leave Dexter and return to Rhode Island, where he currently resides.

Chief Roy's initial call to the Rhode Island Probation Department was not motivated by any racial animus toward Mr. Austin.  Chief Roy had called the Rhode Island Probation Department after learning that Mr. Austin was on probation as a result of a criminal conviction and simply wanted to ascertain the applicable terms of Mr. Austin's probation following his release from prison.  The decision that required Mr. Austin to return to Rhode Island was made solely by his Rhode Island probation officer and Chief Roy played no role in that decision.  Mr. Austin concedes that his extradition to Rhode Island was done at the request of the State of Rhode Island.

Although Mr. Austin has made numerous allegations of a general nature that Dexter police officers were harassing him or his family members or making false accusations about them, Chief Roy never observed nor was able to find evidence of such conduct on the part of Dexter police officers.  Mr. Austin accused Chief Roy of saying that he was incapable of owning his own home, "presumably: because he is African-American".  Chief Roy categorically denies ever making any such statement concerning Mr. Austin's ability to be a homeowner.  Chief Roy also categorically denies the accusation made by Mr. Austin that he has refused to shake Mr. Austin's hand as some type of racially-based slight against him.  Chief Roy has at all times treated Mr. Austin with the same respect he has treated other citizens of Dexter for whom he works.  Chief Roy has treated Mr. Austin with respect even while Mr. Austin was falsely and publicly accusing him of racism and suggesting that he is affiliated with the Ku Klux

17

Klan.  Mr. Austin has publicly called Chief Roy a "racist" and a "bigot" and posted signs at his residence and karate studio to that effect.  Mr. Austin has also written to the Dexter Town Manager and demanded that both she and Chief Roy resign because they are "lazy racist officials" and "inherently racist bigots." In all his interactions with Mr. Austin, Chief Roy took Mr. Austin's complaints seriously and, to the extent the facts allowed it, investigated, or caused to be investigated, the conduct against him or his family of which he was complaining.

When Mr. Austin's son was assaulted by a mixed-race Dexter citizen, the assailant was charged by Dexter police and convicted of the assault.  While Mr. Austin refused to accept that the assailant could not simply be summarily arrested under these circumstances as he was demanding, an appropriate summons was issued and a criminal prosecution successfully pursued.

No criminal charges that have ever been lodged against Mr. Austin by the Dexter Police Department were the result of racial discrimination by the involved officers.  From his own personal experience, Chief Roy is aware that Mr. Austin feels free to make unfounded allegations of racism in very public ways, including posting signs on his property accusing Town officials of being affiliated with the KKK.

The Dexter Police Department has no policy or custom of racial discrimination, including racial profiling or refusing to investigate and/or prosecute individuals committing hate crimes against minority citizens of the Town. Upon receipt of any complaint of hate crimes or racially-motivated crimes, the policy of the Dexter Police Department is to refer the complaint to Corporal Alan Grinnell for an initial investigation.   Officer Grinnell's investigatory results would then be forwarded to the Maine Attorney General's Office, Civil Rights Division. Any prosecution that is deemed appropriate under the State's hate crimes or bias laws is conducted by

18

the State of Maine, and not by the Town of Dexter or its police department.  Mr. Austin also

repeated his accusations against Town officials to Maine's congressional delegation, the

Attorney General's office, and organizations like the NAACP and MCLU.  Chief Roy is not

aware of any investigation by any government agency or the MCLU that concluded Mr. Austin's

allegations of racial discrimination had merit.  Chief Roy is unaware of any complaints of racial

discrimination ever made against the Dexter Police Department's officers by Agnes Austin or the

Austin children.

     The Town of Dexter does not have a policy or custom of deliberate indifference toward

the rights of its citizens, regardless of their race. Mr. Austin made many allegations against many

people in the Town of Dexter, including Town employees and Town officials.  These allegations

include overt acts of racism and membership or affiliation with groups such as the KKK.  Town

Manager Doore has responded to Mr. Austin as she would any other member of the community.

Doore has taken Mr. Austin's complaints seriously.  Doore has investigated Mr. Austin's

complaints where appropriate, despite the usual lack of specifics and his position that all alleged

mistreatment is ultimately traceable to racism.  There has been no evidence to support Mr.

Austin's blanket allegations that racial discrimination formed the basis of the myriad of

complaints he made about alleged unfair treatment by townspeople or Town employees.

***The Austins' Failure to Generate a Genuine Dispute Sufficient to Warrant Trial on the Town of Dexter's Liability for an Equal Protection Violation***

     Based upon the summary judgment record set forth above, the Town of Dexter "has

carried its burden under Rule 56(c)," and the Austins, relying on argument alone, have attempted

to "show that there is some metaphysical doubt as to the material facts," Scott, 127 S. Ct. at 1776

(quoting Matsushita Elec. Indus. Co., 475 U.S. at 586-587).   With respect to the question of

whether or not an employee or employees of the Town of Dexter violated their rights under the equal protection clause of the Fourteenth Amendment, there is no circumstantial or direct evidence that a single Town employee acted with "racially discriminatory intent or purpose." Village of Arlington Heights, 429 U.S. at 265-66 (1977).  Even if there was a genuine dispute of fact on this score, there is no basis to proceed to trial on the theory that the Town of Dexter has a custom or practice of deliberate indifference to equal protection violations of its employees. See Whitfield, 431 F.3d at 13.   The Austins cannot defeat summary judgment by relying on "conclusory allegations, or rank speculation."  Mariani-Colon, 511 F.3d  at 224 (quoting Fontánez-Núñez, 447 F.3d at  55).

### *Conclusion*

I recommend that the Court grant the Town of Dexter's motion for summary judgment against Charles and Agnes Austin (Docket No. 35) and dismiss without prejudice the action apropos S.A., C.A., and A.A.

### *NOTICE*

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive NOTICE memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

March 21, 2008.                                  /s/Margaret J. Kravchuk
                                                         U.S. Magistrate Judge